Good morning, Mates of the Court. My name is Kristina Hellman. I represent Petitioner Jesse von Berckefeldt, and I would like to reserve two minutes of my time for rebuttal. Today I will address the two ineffective assistance of counsel claims in this case and rely on my briefing to address the other issues. The following facts in this case are not in dispute. Othon Campos fired first. He approached the parked car with Mr. von Berckefeldt and Danielle Murray seated inside, looked in, and shot through the window. He shattered the glass, and he narrowly missed Danielle. She screamed that she had been hit, and Mr. von Berckefeldt reacted. He threw her head forward and returned fire, fearing for her safety as well as his own. Despite acting in self-defense and for Ms. Murray's defense, Mr. von Berckefeldt was convicted of attempted murder. Why? For two reasons. First, his attorney did not call Danielle to testify at trial. In fact, his attorney never went to interview Danielle. Failure to investigate a key witness is ineffective. How can you present a defense of others without having the other tell her story to the jury? Second, Mr. von Berckefeldt is guilty. Excuse me, counsel. With respect to witness Murray, counsel did make efforts to locate her, correct? Your Honor, I don't believe the record reflects that. I believe the record reflects that counsel knew that she had gone to an unknown location in California, but that he determined that her testimony was adequately covered by other witnesses who testified about Danielle's statement. Okay. Is either of those things false? In other words, was she actually findable instead of gone someplace unknown? And second, was the absence of her testimony material? To answer your second part of your question first, Your Honor, her testimony was absolutely material. And to go back to the first part. Why? Did other people testify to that, to what she would have testified? Other people said the words that she had said, but nobody else could tell the story. Nobody else was seated in the front seat of that car. Nobody else's life was in danger. There were other people seated in the car who saw that and testified that the other individual fired first. There was one other woman, the driver, Bobbie Jo Dahlbach, who remained in the car, but the two other women got out of the car to try and intercept Mr. Campos to tell him that they didn't want to have a fight with guns. So the three people who knew most about exactly what happened were Othon Campos, the shooter, Danielle Murray, who was almost shot, and Mr. von Birkenfeld. None of those people told the story of the child. How many people testified that the other individual fired first? I don't know how many people, Your Honor. I believe that, I believe at least two, but I can look that up while my opponent talks. But I will concede that the words, I've been hit, were in the record. But I do believe that who says the words, who says the statements, are much more important than what the words say. Okay, and back to my other question. Is there evidence that Murray actually was findable at the time or not? Your Honor, the evidence that we have is that trial counsel says that he was unable to find her because they had gone to an unknown location in California, and that's at Excerptor Record 55. Okay, is that false? However, well, the contradictory evidence that we have, I guess my answer is I don't know if it's false. We have contradictory evidence from Mr. von Birkenfeld himself, Excerptor Record 55, where he says trial counsel told him they had gone to North Las Vegas. So we either have… Sir, trial counsel told him what? Trial counsel told my client that Ms. Murray was in North Las Vegas, and that the state, quote, the state did not want to spend the time or the money to bring them to trial. And whose testimony did the judge believe on that point? In the post-conviction case? Yes. I assume that the judge believed trial counsel because he found that, at Excerptor Record 67, that the facts were fully presented. Okay. So what are we supposed to do with that? Don't we have to observe respect for the district court's credibility resolution as between the two? Absolutely. You have to give deference, but that doesn't mean a complete abdication of a review. And I believe on the record that was submitted that finding the facts were fully presented and that additional witnesses would have simply corroborated what was established is an unreasonable application of Strickland. It is also an unreasonable determination of the facts in light of what was presented because there is no substitute for the person who was a near victim being able to tell her story to the jury. This was an incredibly charged case, incredibly emotional, which actually goes back to my second point, which is that the prosecutor used, in his closing argument, racial code. My client is Hispanic, and the prosecutor said the record is replete with statements. The prosecutor referred to the witnesses as these kids. He said things like the kind of world they're looking from, and he referred to them looking through blood-colored glasses. So when the prosecutor is playing on the emotions of the jury, my client does not even have the one person who could have told the story the best, who could have brought that emotion to the court on his behalf. And why? Because his counsel never went to find her. That's the evidence in the record. It's not that there's no evidence from trial counsel that, yes, I got my investigator, we went out, we looked on the computer, we talked to her mother, her sister, her boyfriend, her employer. We found her, and she said she didn't want to talk to us. That's not in there. It's that he thought she went to somewhere in California, and that's not acceptable. I mean, the Supreme Court is absolutely clear that before a counsel can make decisions that are considered strategic or tactical, counsel must investigate, and that didn't happen. And this court has addressed an incredibly similar situation in the case of Riley v. Payne, where trial counsel did not go and find the critical eyewitness to establish a self-defense case. And that's what happened here. Trial counsel also never objected to any of the statements in the closing argument. And so Mr. von Birkenfeldt was then left with a prosecutor who was telling the jury to convict him based on who he was and not what he did. And this court and other courts are clear that a closing argument that appeals to racial prejudice does go beyond ethical bounds. What is your best illustration that there was an appeal to racial prejudice? I think the over 15 times using the phrase, these kids and the kind of world they're coming from. I also think that the use of blood-colored glasses is... All that sounds like a lot of young people in a violent world, but what does that have to do with race? When you look at the facts with a Hispanic defendant, the majority of the witnesses were Hispanic. This was in Medford during the 90s when there was a rise in gang violence. So if they're young and they're in a gang, you can't refer to them as kids, and you can't refer to blood because it might also indicate... I guess I don't see the connection between kid and Hispanic kid. I don't think it's the idea of kids, Your Honor. I believe it's the phrase, these kids. It's turning them into the other, differentiating the world that they come from from the world that the jurors come from. And I believe that the phrase blood-colored glasses, if not a direct reference to Bloods and Crips, is definitely telling the jurors that they look at the world through rose-colored glasses, and these kids look at them through blood-colored glasses, I believe is an appeal to racial prejudice. It's very hard to say from the words that that's what the effect is. To say that violent gang members look at the world through blood-colored glasses doesn't seem unreasonable. You know, it's possible that with an atmosphere, a particular atmosphere, particular things that would seem reasonable can be taken by a jury somewhat differently. But that's very hard to determine from a record like this. On its face, there's nothing that would tell you that this is a racial appeal. I can understand how you can say that some people might read it that way during an argument, but even if that's a possibility, you know, the failure to object to that is hardly something that you can say is clearly wrong by a counselor. Even if you thought that might be that way, whether you would want to object to that is a matter of judgment also. It's just hard for me to say that this is a sufficiently clear illustration that the words don't mean what they seem to. Your Honor, I'm out of time. I would like to respond to your point, if I may. I think that as I read it, it seems clear to me, but I think what's more important is that the case was not supposed to be about gangs. At Excerpt of Records 62 to 63, the trial court had specifically said before, we're not supposed to go into gang stuff here. This is what's going on. I also think, though, that if trial counsel had objected, he could have prevented all of these statements from coming in. He could have kept the prosecutor to delivering a fair closing argument. And instead, he didn't. And I think that that is a requirement. I think counsel should make sure the prosecution stays on course and doesn't appeal to prejudice in that way. Thank you. Thank you. May it please the Court. Carolyn Alexander for Respondent. I'd like to address counsel's argument first, and then make a couple of comments about some arguments in the reply brief, if I might. First of all, regarding Danielle Murray's statements, Petitioner's own evidence at Excerpt of Record 214 in particular, Murray's statements were inconsistent. The last statement she made to the police was that Rudy Campos did not have a gun in his hand and did not fire first. So beside the fact that Petitioner never put on Murray's testimony or what her testimony would have been had she been located and had she testified, his own evidence shows that her statements were inconsistent. And, in fact, her last statement to the police did not help him. Also — How many people were there who testified that the other person had fired first? Your Honor, I don't think that was ever a disputed — that was ever an issue that the prosecutor ever disputed. Certainly Donna Rodriguez, I believe. I believe Elena Kirsten, who were there, both testified to that. However, it was just — it was a — it was a non-issue. This was a theory of mutual combat. That's what the State pursued. So it was — it was never argued that Rudy Campos didn't fire first. The prosecutor just accepted that. Petitioner's defense was self-defense. So the prosecutor's view of this case was that this was an incident that started way back before that initial or that final shootout, that this was an altercation that had occurred at least a half an hour prior to this particular shootout. And so that just wasn't — that wasn't ever an issue. I wonder how you ever got a conviction. I guess that's the theory. You sold that to a jury. Well, I think how the State got a conviction was the jury just rejected his self-defense defense. The idea that it's 45 minutes later or so after a prior altercation, someone comes up and tries to shoot you, and you shoot back, and you're guilty of murder? Well, what happened in this case, Your Honor, was that — and Petitioner disputes the admissibility of this incident. But 45 minutes before that incident, Petitioner went up to another individual, got into an argument with him, and showed him the gun in his waistband. Fifteen to 20 minutes before the shootout, so again, 20 minutes or so after that incident, the Krogan incident, Petitioner went up to the victim in this case, held a gun to his chest, and tried to pick a fight with him as well. That was admitted, I believe, over — you know, I don't even think that was objected to, and it's certainly not an issue here. So this was a case where unobjected, not raised on appeal, Petitioner put a gun to the victim's chest. The victim said, I'm going to get you. I'll be back to get you. Then 15 to 20 minutes later, we have this shooting incident. So Petitioner, his defense for this shooting was self-defense. He fired first. The prosecutor's view was, if you look at it like that, you bet, you've got to — Well, I don't want to take your time because that's not the issue here. I just said I was curious. Okay. Thank you, Your Honor. The other comment I'd make about Murray was that nobody knows if she was able to be located. She fled right after the — after the shooting. And she made — So no one knows whether she could have been located. Nobody knows what she would have said. Correct. And based on what she did say, it's far from clear she would have been helpful. Correct. Nice summation. At the post-conviction hearing, there was no evidence offered that she would have been willing to testify or that she would have testified favorably. That's correct, Your Honor. That's correct. And it wasn't presented in the federal habeas proceeding either. Regarding the prosecutor's statements, I point out that the prosecutor's appeal to gang and racial prejudice, that aspect of that failure to object to the prosecutor's closing argument claim is procedurally defaulted. That part of the claim was raised for the first time in federal habeas. That was never presented to the post-conviction court. And so, although Petitioner raised an ineffective assistance of counsel claim, as to the okay corral comment and the blood-colored glasses comment, this appeal to racial and gang prejudice was never raised to the state court. And it's the state's position that that aspect of the claim is defaulted under Weaver because the factual basis was never presented. But, in addition, the state disputes Petitioner's characterization that the record shows this appeal to gang and racial prejudice. Judge Graber, you pointed out, I think you got right to the heart of this, which is kids and blood-colored glasses is not an appeal to race. It's not an appeal to gang. These witnesses were between the ages of 14 and 19 years old. They were kids. And they were kids to these jurors. They did live in a violent world. And that was well-established through testimony throughout this trial. There was no – there's nothing in this record. There was no reference to the victim's racial group, any of the witnesses. I don't know if any of those witnesses were Hispanic. The record doesn't reflect that. Maybe they were, maybe they weren't. If – just because they have a Hispanic name doesn't mean they're Hispanic, but certainly there was no reference to that. So I don't see any referral or reference, rather, to race in this record whatsoever. Just a couple of comments about the reply brief. The first one is the argument on independent and adequate state ground. I find that argument incredibly confusing, and I think independent and adequate state ground doctrine is incredibly confusing, but I think it's made more confusing here. This is in reference to the due process claim regarding the Lonnie Krogan incident, the prior bad act that was admitted at trial. That claim is defaulted because the federal due process objection was never made at trial. The objection was made on what appears to be state law evidentiary grounds. And under State v. Moore, Oregon law says that if you don't raise a due process objection at trial, it's not preserved for appeal. Independent and adequate state ground, all that says is, is if the state decision, state court decision, it doesn't fairly appear to rest on federal law, then we don't apply the Harris presumption and assume it rests on federal law. That's fairly simple under Coleman. But the only time independent and adequate ground doctrine comes in is if there's some confusion or the state law decision is ambiguous or unclear. Well, this was affirmed without opinion. That, I suppose, could be argued as ambiguous or unclear, but the preservation law, the state law on preservation that underlies that decision is not ambiguous and it's not unclear. State v. Moore says it's not preserved. Appellate court can't reach it. So it really isn't a corner of egregious or a Coleman v. Thompson issue in this case. One additional point on the expansion of the record that also, I think, is unduly confusing in the reply brief, under Rule 7, or under 2254e2, federal habeas petitioner is not allowed to expand the record or isn't allowed an evidentiary hearing if he doesn't attempt to develop the facts of his claim, not the claim, but the facts of his claim with due diligence in state court. That's a fairly simple rule of law, I think, and under Coopersmith, this Court's decision from Coopersmith v. Palmateer, that's fairly clear. Coopersmith controls in this situation. Petitioner seems to imply that there's an independent basis for admission under 2254d. I have no idea what that means. I think that's incorrect. He cites the three-judge panel opinion in Buckley v. Terhune. That isn't good law any longer. This Court heard briefly that case en banc, and that opinion was vacated. The en banc opinion, which was written by Judge Reinhart, did not adopt that analysis in Buckley. So I don't think Buckley stands for the proposition that petitioner says it does, but even if it does, it's no longer good law. The district court only has discretion to expand the record or to allow an evidentiary hearing when the petitioner has met the requirements of 2254e2, diligently tried to develop the facts of his claim in street court. That didn't happen here. That evidence, although it doesn't help him, wasn't admissible in district court in the Federal Habeas Proceedings below. Does the Court have further questions? Thank you, counsel. Thank you. Your Honor, to answer your question, two witnesses testified that Mr. von Birkenfeld or, excuse me, that Othon fired first. Is it correct that the State's theory was, the State did not argue that the defendant fired first, but part of their case was that the victim had been the first one to fire? I believe that it's correct that the State's theory was a mutual combat theory. However, I do dispute that only 15 to 20 minutes prior was when my client pointed a gun at the victim's chest. I will note, too, that that was in response to the victim reaching for his own gun. Mr. Campos was reaching for a gun in his car, at which point my client put a gun to his chest. The major point, two major points I wanted to make are, one, would Danielle have testified? That's the question. What would she have said? That's the question. The reason we don't know is because trial counsel never went to find her. Well, we could know now. Do you have any post-conviction, any of the post-conviction proceedings? Has there been an affidavit or a declaration or anything that says that she would have testified? There is not in the post-conviction, Your Honor, and that brings me to my second point. Respondent cites Coopersmith. Coopersmith is distinguishable in this case. The information that was submitted in the federal habeas case that shows the State's own position was that Danielle Murray was critical to knowing about the facts, was in the State's control, not in Mr. Von Berkefeld's control. It was a State material witness warrant prepared for a trial of oath on compost. So that's different. In Coopersmith, it wasn't prepared. Is that the only thing you have that suggests that she would have testified favorably to you? That, the police report, underlying police reports, and yes, that's it, Your Honor. But I think the most important point is that counsel never went to look for her, and that's required under Strickland. Well, what evidence is there that counsel never went to look for her, never made any effort to look for her? I believe that his affidavit shows that his decision to look for her was because, not to look for her, excuse me, that his decision was based on her unknown location in California. That's not acceptable. It's not that he tried. He doesn't detail out trying. He just details out that he wasn't entirely sure of her precise location. And that's not enough, especially when she would have been a critical witness. Thank you. Thank you. Case disargued will be submitted. Court will stand in recess. Good morning. Good morning.
judges: Reinhardt, Graber, Lew